MATTER OF MESA

In Adjustment of Status Proceedings

A-12901500

A-12901289

*Decided by Deputy Associate Commissioner September 6, 1967*

While a Cuban refugee applicant for adjustment of status who falls within the provisions of sections 212(a)(15) and 241(a)(8), Immigration and Nationality Act, pertaining to aliens likely to be, or who are, public charges, is not thereby precluded from establishing statutory eligibility under section 1 of the Act of November 2, 1966 as an alien eligible to receive an immigrant visa and admissible to the United States for permanent residence, such factors may be considered in determining eligibility for such relief as a matter of administrative discretion.

These cases are before us by certification, pursuant to 8 CFR 103.4, of the Southwest Regional Commissioner's decision denying the aliens' applications for adjustment of status under section 1 of the Act of November 2, 1966. The denial was based on a finding that the applicants were inadmissible for permanent residence under section 212(a)(15) of the Immigration and Nationality Act, as persons likely to become public charges, hence, statutorily ineligible for the status sought. The decision will be reversed.

The applicants, husband and wife, 55 and 61 years of age, respectively, are natives and citizens of Cuba. They were paroled into the United States as refugees from Cuba on April 9, 1962. They have not since departed from this country and are still in parole status. They now seek a change of status to that of permanent resident aliens.

In pertinent part, section 1 of the Act of November 2, 1966 reads as follows:

"... the status of any alien who is a native or citizen of Cuba and who has been inspected and admitted or paroled into the United States subsequent to January 1, 1959 and has been physically present in the United States for at least two years, *may be adjusted by the Attorney General, in his discretion* and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if the alien makes an application for such adjustment, *and the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence."* (Emphasis supplied).

432

As the Regional Commissioner has acknowledged, the applicants have satisfied the arrival and physical presence requirements of the Act and have made application for such adjustment. However, the Regional Commissioner has found that they have not met the terms of the statute with respect to eligibility to receive an immigrant visa and admissibility to the United States in that they are presently public charges and, as such, come within the proscriptive provisions of section 212(a)(15) of the Immigration and Nationality Act.

The facts are as follows. The applicants arrived in the United States at Miami, Florida in April 1962 and thereafter relocated in San Francisco, California in July of that year. The applicants have acknowledged, and the record shows, that since their arrival in San Francisco they have been jointly supported by funds in the amount of $165.00 a month received from the San Francisco Department of Public Welfare. The record shows that these funds are furnished under that Department's "Cuban program".

At the time of their departure from Cuba the husband was the owner of a coffee roasting firm. Since their arrival in the United States neither applicant has been employed. At an interview, in connection with their applications, the husband stated that he was physically able to work but had not been employed "on account of my age and also due to my poorness in speaking the English language". Parenthetically, it is noted that the interview was conducted in the Spanish language. The husband stated, however, that they plan to return to Miami, at which time they would give up their welfare assistance, where he had offers of employment from two friends, one of whom was a painting contractor and the other the owner of a bakery. He added, "My children are already permanent residents and we wish ours too. In that way we can get better jobs and be better citizens. I am grateful to this country and by having my residence, I feel part of it."

The applicants, who reside with their married son and his wife and child, stated that by joining funds received from the welfare department with the wages earned by their son, who has a modest job, they are able to live comfortably. They have never sought financial assistance from any private organization. They stated that their daughter-in-law is also employed and during the absence of the son and daughter-in-law the applicants care for their granddaughter. The applicants also have a married daughter who is employed, as is her husband. This couple also have a child and do not contribute to the support of the applicants. As previously indicated, both of the applicants married children have acquired lawful resident alien status. The applicant husband stated that in the event the funds received

433

from the welfare department were discontinued he is confident that their children would take care of them.

Section 212(a)(15) of the Immigration and Nationality Act, a ground for the exclusion of aliens, the provisions of which the Regional Commissioner has found to be a statutory bar to the granting of these applications reads as follows:

Aliens who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney General at the time of application for admission, are likely at any time to become public charges;

A similar ground for the expulsion of aliens, is contained in section 241(a)(8) of that Act and reads:

In the opinion of the Attorney General, has within five years after entry become a public charge from causes not affirmatively shown to have arisen after entry;

It is well settled that aliens who are likely to be, or who are, supported at the expense of the public because of poverty or some physical handicap come within the above statutory proscription. See *Matter of M—* and *Matter of T—*.[1] Accordingly, if the provisions of section 212(a)(15), *supra*, apply to applicants for adjustment under section 1 of the Act of November 2, 1966, on the facts here these applicants are, at present, statutorily ineligible for the status sought, as found by the Regional Commissioner.

In that regard we also find it necessary to consider the above ground for expulsion under section 241(a)(8), *supra*, for the obvious reason that it would be purposeless to find such applicants to be eligible for visas and admissible and grant the applications for adjustment if the factual situation showed that they would immediately thereafter become deportable under that expulsion provision. In fact, it has been held that such a situation would support a finding of inadmissibility even though not a specific statutory ground for excludability.[2] Assuming arguendo, however, that such would not apply to this particular expulsion ground, the sound exercise of discretion, provided for in the Act of November 2, 1966, would generally warrant denial of an application if in fact the alien would be deportable thereunder.

The purpose of the Act upon which these applications are based is to provide a ready means to permit certain Cuban refugees in the United States to adjust to permanent resident status, in the discretion of the Attorney General, if they are eligible to receive an immigrant visa and are admissible for permanent residence. Many of these refugees are presently impoverished by force of circumstances beyond their control and are dependent upon Federal assistance. A major ob-

---

[1] 2 I. & N. Dec. 131; 3 I. & N. Dec. 641.
[2] *Matter of V—*, 1 I. & N. Dec. 293; *Matter of R—G—*, 8 I. & N. Dec. 128.

jective of this opportunity for adjustment of status was, therefore, to aid in these refugees' resettlement by enhancing their opportunity to qualify for employment here and in turn reduce the Government's expenditures in their behalf.[3]

It is axiomatic that laws remedial in nature, such as the Act under discussion, should be construed liberally. This then becomes a question of statutory interpretation of its qualifying terms relating to eligibility to receive a visa and admissibility to the United States with respect to section 212(a)(15) and section 241(a)(8), *supra.* As was pointed out in *Matter of S. S. Annik,*[4] the primary rule in that regard is that the intent of the legislation is to be carried out. The meaning of the statute is to be found in its words, without resort to any materials dehors the words of the statute itself, since it is presumed that the legislature chose apt words to express its intention. But these rules of statutory construction must yield in situations in which it can be demonstrated that adherence to them would defeat the intention of the legislature. It has been said that canons of construction were evolved as aids in determining the intent of the legislature in enacting statutes, not as limitations in determining such intention.[5]

*S. S. Annik, supra,* goes on to state that a well recognized basis for departing from the rule that a statute must be given its strict literal interpretation exists where application of the rule would lead to an absurd, unjust, or unreasonable result. One of the classic illustrations of departure from the strict letter of a statute is the case reported in Plowden, which held that the statute of King Edward II, which provided that a prisoner who breaks prison is guilty of a felony, did not extend to a prisoner who breaks out because the prison was on fire— "for he is not to be hanged because he would not stay to be burnt."[6]

We shall therefore briefly review the history of the legislation under reference[7] to determine whether strict literal application of the provisions mentioned would be consistent with the intent of the Congress. Commencing early in 1959 the Cuban Government, under Fidel Castro, turned that country into a Communist dominated area and enacted laws confiscating private property and other legislation oppressing

---

[3] H.R. Rep. No. 1978 89th Cong. 2d Sess. (9/1/66).

[4] 1 I. & N. Dec. 418 at 420.

[5] *Barrett* v. *Van Pelt,* 268 U.S. 85; *Van Camp & Sons Company* v. *American Can Company,* 278 U.S. 245; *Danciger* v. *Cooley,* 248 U.S. 319; *Boston Sand and Gravel Company* v. *United States,* 278 U.S. 41.

[6] *United States* v. *Kirby,* 7 Wall. 482.

[7] Except where otherwise indicated, the general reference sources are as follows: H.R. Rep. No. 1978, 89th Cong., 2d Sess. (9/1/66); S. Rep. No. 1675, 89th Cong., 2d Sess. (10/4/66); 112 Cong. Rec. 170, pp. 24453–55 (10/6/66); 112 Cong. Rec. 158, pp. 21088–94 (9/19/66).

the rights of its people. As a result, Cubans began to seek asylum in the United States in ever increasing numbers. These refugees, in the main, because of the circumstances of their departure arrived with little in the way of money or valuables and most of those that were fortunate enough to have either, soon found their assets exhausted. As Miami, Florida was the most accessible port from that country, the impact of this large number of Cuban refugees was first centered in that State.

In early 1961, the late President John F. Kennedy directed the establishment of a Cuban Refugee Program under the Department of Health, Education and Welfare to alleviate the plight of these refugees. In June 1962 Congress enacted the Migration and Refugee Assistance Act of 1962 [8] authorizing the President to, among other things, render further assistance to qualified refugees who "are in urgent need of assistance for the essentials of life." In addition to the latter, the Act provides for assistance to State or local public agencies providing services for qualified refugees; health and educational services; special training for employment and for the expense of transportation to, and resettlement in, other areas of the United States, as well as other benefits.

By Executive Order 11077, effective July 1, 1962,[9] implementation of these aspects of that Act was assigned to the Secretary of Health, Education and Welfare. This program has been continued under the Cuban Refugee Program of that Department.[10]

In general, financial assistance is furnished under this program by the various State and municipal welfare departments who in turn are reimbursed therefor from Federal funds provided for the program in accordance with provisions of the Migration and Refugee Assistance Act, *supra*. That Act does not foreclose the use of these funds for these alien refugees after they have had their status adjusted to that of lawful permanent residents and such financial or other assistance necessary to the well being of these people is continued to be extended where needed.[11] The Committee reports clearly reflect that the Congress in considering the enactment of the Act of November 2, 1966 was deeply conscious of the financial plight of these people and a major reason for the bill's enactment, as previously indicated, was to stabilize these refugees' immigration status as an essential element toward assisting them to become self-sufficient by removing or alleviating

---

[8] P.L. 87-510.

[9] 28 FR 629.

[10] Hearings: Subcommittee #1; House Committee on the Judiciary, 89th Cong., 2d Sess., #20. August 10, 11 & 17, 1966 (pp. 49-71).

[11] Cong. Rec. 170, p. 24454 (10/6/66); 112 Cong. Rec. 158, p. 21987 (9/19/66).

some barriers to employment stemming from the lack of firm roots, and thereby aid in reducing the Government's expenditures in their behalf.

It is clear from all of the foregoing that the Congress was keenly aware of the need for and receipt of assistance, financial and otherwise, by the beneficiaries of the then proposed legislation. Also, with regard to possible deportability of Cuban recipients of financial assistance, one of the cooperating voluntary social agencies expressed concern to the Senate Subcommittee that because "a Cuban refugee has been receiving public assistance and support * * * through our Cuban Refugee Program * * * they might be subject to deportation on the basis of indigency. We would like to see that this situation should not develop * * *". To which a committee member responded in pertinent part, "* * * the ha: d fact, * * * is that economic issues do not permit the absorption of all these people, and the problem that you suggest might cause trouble unless we anticipate it. It is a deportable thing, I am told, for an alien. But I would be amazed if that rule of law was ever applied in the circumstances we find existing there".[12]

We conclude that Congress, in setting out the requirement in the Act of November 2, 1966 that an alien applicant be eligible for a visa and admissible to this country, did not intend requiring application of the provisions of section 212(a)(15) or section 241(a)(8) of the Immigration and Nationality Act, *supra*, in light of the Congressional history showing the recognized impoverished circumstances of many of the refugees it proposed to benefit and the special legislation enacted to render them Federal assistance. Otherwise, to apply those provisions would have the effect of materially defeating the humanitarian purpose for enactment of the Act. Indeed, President Lyndon B. Johnson, in directing the waiver of permanent resident application fees stated that he did so "on humanitarian grounds" in that "Cuba requires that refugees coming to this country turn over to the Cuban Government any worldly assets they own before leaving the country. Most Cuban refugees are able to accumulate very few resources in a two-year period." [13]

It is found, therefore, that the statutory ground of ineligibility asserted by the Regional Commissioner is not sustained and that the applicants are eligible for the status sought.

There remains a question as to whether the applications should be granted as a matter of administrative discretion. The fact that the above-cited exclusion and expulsion grounds are found not to be a statutory bar does not necessarily preclude denial of an application as

[12] Hearings: Subcommittee on I. & N., Senate Committee on the Judiciary, 89th Cong., 2d Sess., Vol. 1, August 16, 1966 (S. 1241, S. 3712), pp. 35–37.

[13] Presidential Documents, Monday, November 21, 1966, Vol. 2, No. 46, pp. 1682–83.

a matter of discretion [14] if it is found, for example, that circumstances with respect to the acceptance of public assistance were such that the applicants were not deserving or that their presence here on a permanent basis would not otherwise be in the best interests of the United States.

In the foregoing regard, the character of the subjects is unquestioned. It is noted that the monthly monetary amount they receive is moderate and is supplemented by earnings of their son and daughter-in-law, with whom they live; that the applicant husband is willing to work but has been handicapped by the language barrier and that he has actually taken action, apparently prior to the notice of denial of their applications, to separate his wife and self from their children in order to seek prospective employment in another area. Bearing in mind the recognized fact that Cubans have a strongly family-centered culture [15] the latter evidences the sincere desire of the male applicant and his spouse to be self-sustaining. In that regard we note his comments previously quoted. "My children are already permanent residents and we wish ours too. In that way we can get better jobs and be better citizens. I am very grateful to this country and by having my residence, I feel part of it".

It is concluded that favorable exercise of discretion is warranted. An appropriate order will be entered.

*It is ordered* that the order of the Regional Commissioner be, and hereby is, reversed and the applications granted.

---

[14] Compare *Matter of H—R—*, 7 I. & N. Dec. 651.

[15] Hearings: Subcommittee on I. & N., Senate Committee on the Judiciary, 89th Cong., 2d Sess., Vol. 1, August 16, 1966 (S. 1241, S. 3712), p. 54.